## Newell and Pierce, Appellants, *v.* Hamer *et al.*

A voluntary postponement of an execution on a forthcommg bond by the creditor at the suggestion of the principal debtor, does not discharge the security, when there is no consideration for the indulgence, nor any binding agreement to delay the execution of the judgment until a particular period.

There must be a positive and binding agreement, based upon a valuable consideration, sufficient to tie up and restrain the creditor during the time for which the indulgence is given, or it will not be a fraud upon the rights of the security, nor discharge him from liability.

The surety in a forthcoming bond after forfeiture, still stands in the light of a surety.

APPEAL from the circuit court, for the county of Yazoo.

On the 22d day of February, 1838, the appellees recovered judgment against Camp P. Newell, in the Yazoo circuit court, for the sum of $7885 56, and costs of suit; and execution having issued thereon, the 31st of March, 1838, the sheriff of Yazoo returned that he had levied the same on 12 negroes, naming them, and took a bond for the delivery of them, with Marcus Pierce security. Which bond having been returned forfeited, an execution issued thereon against the principal and surety, which execution was sued out by said M. B. Hamer & Co. by their attorneys, on the 21st day of July, 1838, upon which execution (a *fieri facias*) the sheriff of Yazoo made the following return: "Received, July 27th, 1838: held up by order of M. B. Hamer & Co. as per letter filed." Afterwards, on the 4th day of March, 1839, the said M. B. Hamer & Co. by their attorneys, sued out another writ of *fieri facias* on the forthcoming bond against the principal and surety, on which execution the sheriff returned, "satisfied out of the proceeds of the property sold at sheriff's sale, as the property of Marcus Pierce, May 28th, 1839."

The first execution which issued on the forthcoming bond, was returnable the 3d Monday in November, 1838. The second execution, on which the property was sold, was returnable the first Monday in May, 1839. On the 28th day of May, 1839, the ap-

[Newell and Pierce, Appellants, *v.* Hamer *et al.*]

pellant, Marcus Pierce, moved the court below to quash the execution on the forthcoming bond, and assigned as the ground of the motion, that the plaintiffs in the execution had by holding up a previous execution in the case, without the knowledge or consent of the appellant, and which had operated to his prejudice, released him from any and all responsibility or liability on said execution; he being merely security on said bond, which motion the court overruled.   The appellant then tendered his bill of exceptions to the opinion of the court.   The appellant produced on the trial, the motion, and read to the court the letter from said M. B. Hamer & Co., dated November 9th, 1838, directed to the sheriff of Yazoo county, as follows: "P. Buford, Esq., sheriff of Yazoo county, you will please hold the execution in our favor against Camp P. Newell, Esq. until further orders from us, Mr. Newell has agreed to deliver us cotton in payment," which letter was admitted to apply to the execution in this case, then in the hands of the sheriff.   The appellant also produced said first execution upon which the sheriff had made the following return: "Held up by M. B. Hamer & Co. as per letter filed."   The appellant then introduced a witness and offered to prove that at the time the former execution was held up, the said C. P. Newell had in his possession and was the owner of sufficient property to satisfy the same, and out of which money could have been made sufficient to satisfy said execution, and that since said execution was so held up, the said C. P. Newell had become insolvent.   But the court refused to hear said evidence.   Appeal granted.

Thompson, for appellant.

It is conceded that as long as the creditor is *merely passive*, all his remedy remains, and that he is not bound in the general, to active diligence, as seems to be established by the cases, (among others,) of English *v.* Daily, 2 Bos. & Pul. 61; 12 Wheaton's Rep. McLemore *v.* Powell, 554.

But then on the other hand we contend that the doctrine is equally well established,

*First*, that where the creditor makes a valid and binding contract with the debtor, to give further time of payment, (even for one moment as some of the authorities say,) without the concurrence of the surety, it is a discharge of such surety.

[Newell and Pierce, Appellants, v. Hamer et al.]

*Secondly*, that the surety will also be discharged, where the creditor does any act which is prejudicial to the rights of the surety, without consulting him, for this operates as a fraud upon the surety.

Upon the first point, the law is settled beyond controversy. See 2 Paige Rep. 499, Sailly *v.* Elmore, 10 John. Rep. 593. 2 Caines' Cases in Equity, Nesbit *v.* Smith, page 1. 2 Brown's Chancery Cases, 579. 2 Vesey, Junr. 540. 4 Vesey, Junr. 824, 833. 17 John. Rep. King *v.* Baldwin, at page 389. The enquiry arising on the first point, is, not whether the surety has been injured by the arrangement between the creditor and his principal, but simply whether an agreement for indulgence, valid and binding, without his consent, has been made; the law will not permit the enquiry to be made, whether the agreement was beneficial, or prejudicial to his rights, for when the agreement is made without his concurrence, he is *ipso facto* absolved from his obligation.

The question arising upon the *second* point is of a different character. The enquiry here to be made is, *how has the creditor acted? What has he done? Was that act prejudicial to the rights of the surety? Did he sustain any injury thereby?* The enquiry is not confined to the mere indulgence, but it is directed to *that active interference* on the part of the creditor, which from its very nature may prove highly detrimental to the interests of the surety, and which, if the injury should ensue, is considered in law *a fraud* on the rights of the surety, and he discharged from his liability, because of that fraud. See 2 Paige's Reports, 499. 17 John. Rep. King *v.* Baldwin, at page 389. 10 John. Rep. Rathbone & Rathbone *v.* Warren, page 587.

Before applying the law to the facts of the present case, we deem it important to consider the various legislation of the state of Mississippi in relation to securities; the extent of their liability, immediate, and ulterior, as defined by the statutes; the safeguards against loss and ruin that are thrown around them, the great solicitude evinced by the makers of the law, that all the means of the principal should be exhausted before the surety shall be interrupted. And from the intent and object of the different statutes on this subject, we believe that much slighter acts of the creditor, calculated to defeat the provisions of the law, will

release a security, than would have had that effect, had not such enactments been made.

The first statute we notice is the act of 1822, Revised Code, page 432, sec. 47, which provides that "when execution shall issue against any principal and security on any bill, bond, note, or other instrument, the sheriff or other proper officer shall be authorised, and he is hereby directed to levy on the property of the principal first, if he have any property in the county where the security resides; provided, the said security make oath or affirmation before some justice of the peace, that he is security," &c. &c. In this case the execution which issued on the forthcoming bond, shows upon its face that Marcus Pierce was only the security, hence no affidavit would be necessary.

The act approved 13th May, 1837, prohibits the levy of an execution on the property of *a security*, when the principal has sufficient property in the state to satisfy such execution; and if a plaintiff should violate this law, in a suit against him for trespass, the jury who try the cause are required to award exemplary damages. *These statutes show the light in which securities are held* by the legislature, and the protection intended to be given them.

Now, upon the first point, did the plaintiffs below make an agreement that was valid and binding to give Camp P. Newell, the principal, indulgence? We contend that they did, and we adduce their letter in proof of the fact: the execution was then in the sheriff's hands against Camp P. Newell, the principal, and the appellant, his security; it was returnable the 3d Monday in November, 1838. On the 9th of November, 1838, the appellees, the plaintiffs in the execution, wrote to the sheriff directing him to hold up the execution till further orders, saying "*Mr. Newell has agreed to deliver us cotton in payment.*" Here was a good consideration for the contract of indulgence, an agreement to deliver *merchants* cotton in payment is a valid agreement. Why not? It was a thing to be done; Mr. Newell was to proceed to make the delivery of the cotton. Suppose while he was in good faith preparing to make the delivery, the plaintiffs in the execution had departed from their agreement and had ordered the sheriff to levy the execution, could not Newell have filed his bill in chancery, enjoined them from proceeding on the execution, and have compelled them to receive the cotton according to agreement. If A.

agrees to deliver B. his crop of cotton, or as much cotton at a fixed price, or at the market price, as will come to a certain sum of money, and B. agrees to pay him that sum of money, the agreement, we conceive, would certainly be valid and binding, and either party would be liable to the other for violating it. We can perceive no difference between the supposed case and the real one.

It is not like the case would have been, if the letter to the sheriff had merely been to hold up the execution till further orders, or till further orders, as Mr. Newell has agreed to pay us at a particular time, naming it. In that state of case, there would have been no consideration, the plaintiffs would have been getting nothing but what they were entitled to before, and they could have disregarded their promise at any moment. But not so here: they were by the agreement, to get what they otherwise were not entitled to, which was a new and a legal consideration, and one that made the agreement valid and binding.

Upon the *second* point, we contend that the plaintiffs in the execution did, when the execution was in the hands of the sheriff, and in obedience to the commands of the writ, and of the statute, was about to be levied on the property of the principal, actively interfere and prevent the levy, and so held up the execution till the return day, and in the mean time the principal had become insolvent. And that in law this was a fraud on the surety, which will discharge him from his liability.

In the case of Sailly *v.* Elmore, 2 Paige, 449, the chancellor after stating the general doctrine, that if the creditor makes a valid and binding contract with the principal debtor to give further time of payment without consulting the security, it discharges the security, adds "He will also be discharged by any *agreement or dealing* between the principal debtor and creditor, which operates *as a fraud* upon the surety. As if the money had been offered to the creditor at the day it fell due, or afterwards, and he had without the consent of the surety requested the debtor to retain it longer, this would operate *as a fraud* upon the surety and discharge his liability."

So here the creditor is not merely passive, but when the property is about to be levied on and sold to satisfy the debt, the property of the principal debtor which the statute makes primarily liable, the creditor steps forward, commands that it shall not

be done, has the execution held up, and returned without being levied, the principal becomes insolvent, and the creditor immediately has a new execution issued and levied on the property of the surety.   Is not this a fraud on the surety?

In King *v.* Baldwin, 17 Johnson, at page 389, Chief Justice Spencer says, " without referring to any other authority, the case of Rathbone & Rathbone *v.* Warren, decided in this court, (10 John. Rep. 587,) with entire unanimity establishes the principle, that if the creditor does an act *impairing the rights of the surety*, or varies the term of the obligation, or enlarges the time of performance without consulting the security, the latter will be discharged."

The indulgence given by M. B. Hamer & Co. under the circumstances, was a waiver of the lien of his judgment on the property of Newell, and gave both to younger judgments or innocent purchasers a preference over his judgment, by one of which means no doubt the property of Newell was exhausted, although it does not appear by what means, because the judge refused any evidence.   This very act, therefore, caused the necessity of looking to the security for payment.   See Peck's Rep. 36, and 4 East, 522 ; 3 Yerger, 481.

That a court of law will give redress in a case where the surety is discharged by the improper acts of the creditor.   See 17 John. Rep. 390, 394 ; Rex *v.* Barrington, 2 Vesey, Junr. 542 ; 7 John. Rep. 336, People *v.* Johnson.

The surety in the forthcoming bond stands after forfeiture, as any other surety.   See the case of Reid *et al. v.* Watts *et al.* 4 J. J. Mar., 440, as bearing in analogy and reason on the present case.

G. S. Yerger, for appellees.

1. The defendant, if entitled to any relief at all, is not entitled to it upon a motion to quash an execution, which execution was dead at the time, and the money collected under it.

2. The motion to quash by one of several defendants, upon the ground that he was surety, and time had been given, &c. is, to say the least of it, novel, and if sustained, necessarily prevents the plaintiff from recovering from the principal.

An execution against two or more is an entire thing; it must conform to the judgment.   If the judgment is against two, it must issue against them both.   It therefore follows, that, the execution

58*

being entire, if quashed as to one, must necessarily be quashed as to both.    It could not be quashed as to Pierce, because it must issue in the name of both.    This subject is well examined by Judge Tucker, in the second volume of his Commentaries, page 364, 365, and his conclusion is, that an execution cannot be quashed, on the above grounds.

3. The forthcoming bond has the force and effect of a judgment, and at law the suretyship is extinguished, and both are considered as principal debtors.    5 John. Ch. Rep. 305; 3 Wheat. Rep. 520; 15 John. Rep. 433; 5 Wendal, 501.

4. When a creditor stays an execution for a definite period of time, it is a fraud as to younger executions, as decided by this court in the case of the Planters' Bank *v.* Michie.    But this principle only applies as between judgment creditors; not to one of several defendants.    But even if the rule was in full force, not only as between judgment creditors, but all the world, it could have no application here, for, as in the case of the Planters' Bank, there must be some fixed and definite period for the stay.    The creditor must stop himself from proceeding.    Now in this case there was no agreement to stay.    The plaintiff says, " it is stayed until further orders."    He could have issued an execution the next moment.

5. It is settled that to discharge a surety, the principal must stay his hand, by *contract* binding on him, (McLemore *v.* Powell, 12 Wheaton's Reports,) and it must be for a fixed and definite period of time.    (17 Wend. Rep. 501.)

When an elder judgment creditor holds up his execution, it is a fraud on a younger execution creditor; and it will let in the younger execution creditor on this ground, although there is no binding contract.    But as to sureties, they must show a binding contract.    Here there was no contract, or consideration for the contract.    The cotton was not delivered, and the execution might have issued the next moment.

This precise point has been decided, and it is held that in such a case as the above, a court of equity will not relieve the party.    See 1 Leigh's Rep. 434, and 4 *Ib.* 622, which are precisely in point.

Mr. Justice TROTTER delivered the opinion of the court.

It is a well settled principle, that if a creditor by an agreement

with the principal debtor, enlarges the time of payment without the consent of the surety, the latter is thereby discharged. 3 Merivaile's Rep. 272; 10 J. R. 591; 2 Bro. Ch. Cases, 579; 17 J. R. 389; 2 Vesey, Jr.; 540.   Such power is denied to the creditor upon the clearest reasons of policy and justice.   It is in effect a violation of the terms of the contract by which the surety became bound, and is certainly a breach of good faith.   A mere voluntary indulgence to the debtor, however, is not within the policy of this rule, and abridges none of the rights of the creditor.   There must be a positive and binding agreement; and for this purpose it must be based upon some new and valuable consideration, which is sufficient to tie up the creditor, and prevent him from asserting any remedy during the time for which the indulgence has been given.   This is settled in nearly all the cases which have just been referred to; and has been so decided in every case when the question has been directly presented for the consideration of the court.   This interferes with none of the rights of the surety, and cannot prevent him from a resort to any prescribed remedy.   He may arrest the indulgence so given by a demand upon the creditor to sue, after which it can be continued only at the risk of the creditor.   Thus in the case of McKenny's Executors *v.* Walter, 1 Leigh, 436, it was proven that Walter, the principal debtor, had, at the time the execution in that case was issued, property in his possession amply sufficient to satisfy the whole amount of the debt.   That the sheriff was about to levy on it, when the creditor at the earnest solicitation of the principal debtor, consented to give indulgence, which was done without the knowledge or consent of the surety.   The sheriff was instructed not to levy the execution *until the plaintiffs should see him.*   The execution was accordingly returned, "not executed, by order of the plaintiffs."   The debtor subsequently removed the greater part of his property. The officer in consequence of this was unable to make the amount of the execution out of the property of the principal, and for the residue levied the process on the property of the surety.   On this state of facts he sought to be relieved in equity, and filed his bill for an injunction, but the court without hesitancy refused his application.

In the case of Alcock *v.* Hill, 4th Leigh, 626, the execution which was against the principal and sureties in a forthcoming bond

was suspended by the directions of the plaintiff, "until further orders." The surety insisted that he was discharged, because he had not consented to the indulgence. But the court held that he was not. It is there said, that to constitute an agreement for extending the time of payment, which shall be sufficient to discharge the surety, four things are necessary. 1st. A consideration, for without it a promise to indulge is not binding. 2d. A promise to indulge. 3d. That the promise should not be altogether indefinite, for an indefinite promise is nugatory. And 4th. That the surety has not assented. The principle of these cases is fully recognised in all the authorities, and is decisive of the case at bar. The agreement was of no benefit to the debtor, since the creditor could arrest the indulgence at any hour, it being entirely indefinite as to time. The surety was not therefore prejudiced, because the plaintiffs had reserved the power to press the collection of the debt whenever the surety might request them to do so, or their interests might demand it. It is not necessary to consider whether the agreement in this case was founded on a good consideration, as it is manifest that the promise was nugatory, as the order was liable to be revoked at any moment. But we do not think there was any binding consideration. If the cotton had been actually delivered to the plaintiffs, it would be different, as it was a mere promise to deliver in future, however, we think it was as much as if the debtor had promised the money due on the execution at some future time. It is not like the case of a partial payment in consideration of forbearance for the residue. Neither of the parties to this agreement could support an action upon it. The promise of indulgence was of no benefit to Newell, because it was indefinite, and open to a revocation by Hamer & Co. at any moment. The promise to deliver the cotton contained in this written agreement was therefore not binding on Newell, because it was without consideration.

This being the case, it is unnecessary to notice the other ground assumed in the argument by the counsel for the appellants. Which is, that though the agreement in this case is not sufficient to bring it within the general rule by which the surety is discharged, yet it is in fact such a positive act of interference by the creditor as amounts to a fraud upon his rights. We do not think so. This is clearly no more than the case of a voluntary exten-

[Newell and Pierce, Appellants, *v.* Hamer *et al.*]

sion of time to the debtor, granted, as it appears, with the hope and in the expectation that the debt would be paid as promised, by a delivery of cotton, which would supercede the necessity of exposing the property of Newell to the hazard of a sacrifice by a sale under the hammer of the sheriff. This was no fraud upon, or violation of any of the rights of the surety, since the terms of the indulgence left him at liberty to stop it whenever he saw proper. If these views be correct, it was surely quite unnecessary in the court below to hear proof as to the solvency of Newell at the date of the instructions to suspend the execution. The application of Pierce was not to be decided by that criterion. His exemption from liability on his contract depended on the nature of the agreement, and its tendency to prejudice his rights. In the language of the court, in the case of Sailly *v.* Elmore, 2 Paige's Ch. Rep. 499, " there must be some arrangement or dealing between the principal debtor and creditor which operates as *a fraud* upon the surety." A mere consent to delay payment cannot be so considered. We are hence of opinion, that upon principle, as well as authority, there is no ground for the relief which has been applied for by the surety in this case.

It may be proper to notice an objection which has been taken by the counsel for the appellees to the relief asked for, before closing this opinion. It is said that the motion to quash the execution could not be sustained, whatever title to relief Pierce may have. For the execution is an entire thing, and cannot be set aside as to one defendant and remain good as to the other. It is undoubtedly correct to say, that on a judgment against two, the execution must be against both, for it must follow the judgment. We are accordingly of opinion, that the surety should have resorted to some other mode to obtain the relief which he claimed. It has been urged that Pierce ceased to stand in the relation of a surety, after the judgment on the bond, but we are not of that opinion. The cases which have been already cited from 1st Leigh, 436, and 4th do. 626, as well as the case of Reid *v.* Watts, 4th J. J. Marshall, 440, were precisely like the present, and the relation of surety was held to continue.

Let the judgment be affirmed.